**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CINDY BRYAN, Administratrix and
Personal Representative of the
Estate of Shirley A. Robertson,
deceased,
<u>Plaintiff-Appellant,</u>

v.                                                             No. 95-2023

RECTORS AND VISITORS OF THE
UNIVERSITY OF VIRGINIA, t/a
University of Virginia Medical
Center,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-95-220-A)

Argued: May 9, 1996

Decided: September 13, 1996

Before MURNAGHAN and WILLIAMS, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by published opinion. Senior Judge Phillips wrote the opin-
ion, in which Judge Murnaghan and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Michael Vincent Greenan, MICHAEL V. GREENAN,
P.C., Warrenton, Virginia, for Appellant. Gerald Richard Walsh,

GERALD R. WALSH, P.C., Fairfax, Virginia, for Appellee. **ON BRIEF:** Michael J. Carita, GERALD R. WALSH, P.C., Fairfax, Virginia, for Appellee.

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

Cindy Bryan, as administratrix of the estate of Shirley Robertson, brought this action against the University of Virginia under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (1994). She alleged that the university's hospital failed to provide Mrs. Robertson with the stabilizing treatment that the Act requires and thereby caused her death. The hospital moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, and the district court granted the motion. We affirm, though on somewhat different grounds than those relied upon by the district court.

I.

The gist of Bryan's complaint is that the hospital violated EMTALA when, having treated Mrs. Robertson for an emergency condition for twelve days, it determined pursuant to its internal procedures that no further efforts to prevent her death should be made and then eight days later, when Mrs. Robertson faced a life-threatening episode, adhered to its prior determination and allowed her to die. The complaint reads, in pertinent part, as follows:

> 4. On February 5, 1993, Shirley Robertson was transferred from Fauquier Hospital to the University of Virginia Medical Center for an emergency medical condition, most emergently, respiratory distress.

> 5. At all times relevant, The university of Virginia Health Science Center (U.Va.) received clear instructions from Mrs. Robertson's husband, Charles and all of her chil-

2

dren that the Defendant Hospital take all necessary measures to keep her alive and trust in God's wisdom.

6. In violation of 42 USC §1395dd, the Defendant hospital refused to be instructed by the husband and family of their patient Shirley Robertson, and on February 17, 1993, entered "do not resuscitate" order against the family's wishes.

7. As a result of the "do not resuscitate" order, Mrs. Robertson was not stabilized and died on February 25, 1993.

In dismissing the action, the district court interpreted the complaint as alleging a violation of subsection (b) of the Act, which requires a hospital to stabilize or transfer any patient who arrives at the hospital with an emergency condition. It then held that the Act imposes no obligations on a hospital once the hospital has admitted the patient. At that point, according to the district court, the hospital's obligations are covered by state tort law, and EMTALA is out of the picture. Since Mrs. Robertson had been admitted to the hospital long before the occurrence of the hospital's alleged misdeeds, the complaint did not state a claim under EMTALA. On this basis, the court dismissed the action on the merits.

This appeal followed.

II.

Bryan's essential contention is that EMTALA imposed upon the hospital an obligation not only to admit Mrs. Robertson for treatment of her emergency condition, which concededly was done, but thereafter continuously to "stabilize" her condition, no matter how long treatment was required to maintain that condition. Such a theory requires a reading of the critical stabilization requirement in subsection (b)(1) of EMTALA that we cannot accept.

Subsection (b)(1) provides that:

If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--

3

> (A) . . . for such further medical examination and such treatment as may be required to stabilize the medical condition, or

> (B) for transfer of the individual to another medical facility . . . .

Bryan's proffered interpretation of that subsection is boldly that, "If a hospital . . . accepts a patient with an emergency medical condition either by admission or transfer and continues stabilizing treatment for any period of time, whether it be one hour, one week or twelve days and then refuses such stabilizing treatment, such refusal of stabilizing treatment without transfer violates EMTALA." Appellant's Brief at 5.

As is admitted in the complaint, and so necessarily conceded by Bryan in her brief and oral argument, stabilizing treatment was provided by the hospital from Robertson's arrival on February 5 until February 17. But, the claim is that the hospital's abandonment of such treatment as of its entering the anti-resuscitation order on February 17 and its failure to offer stabilizing treatment in response to Robertson's heart attack eight days later constituted an EMTALA violation.

Under this interpretation, every presentation of an emergency patient to a hospital covered by EMTALA obligates the hospital to do much more than merely provide immediate, emergency stabilizing treatment with appropriate follow-up. Rather, without regard to professional standards of care or the standards embodied in the state law of medical malpractice, the hospital would have to provide treatment indefinitely--perhaps for years--according to a novel, federal standard of care derived from the statutory stabilization requirement. We do not find this reading of the statute plausible.

As Bryan recognizes and as this court has frequently observed, EMTALA is a limited "anti-dumping" statute, not a federal malpractice statute. Vickers v. Nash Gen. Hosp., Inc. , 78 F.3d 139, 142-43 (4th Cir. 1996) (citing numerous cases). Its core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat. Brooks v. Maryland Gen. Hosp., Inc., 996 F.2d 708, 710 (4th Cir. 1993) (recognizing that"[u]nder traditional

4

state tort law, hospitals are under no legal duty to provide [emergency care to all]" and holding that EMTALA's purpose is simply to impose on hospitals the legal duty to provide such emergency care); Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991) (holding that EMTALA's purpose is "to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat"). Numerous cases and the Act's legislative history confirm that Congress's sole purpose in enacting EMTALA was to deal with the problem of patients being turned away from emergency rooms for non-medical reasons. See, e.g., Correa v. Hospital San Francisco, 69 F.3d 1184, 1189 (1st Cir. 1995) (Congress enacted EMTALA because it was "`concerned about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance.'") (quoting H.R.Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), reprinted in 1986 U.S.C.C.A.N. 42, 605), cert. denied, 116 S. Ct. 1423 (1996); Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1255 (9th Cir. 1995) (Congress enacted EMTALA "in response to `a growing concern about the provision of adequate emergency room medical services to individuals who seek care. . . .'") (quoting H.R.Rep. No. 241(III), 99th Cong., 1st Sess. 5 (1986), reprinted in 1986 U.S.C.C.A.N. 42, 726); Cleland v. Bronson Health Care Group, Inc., 917 F.2d 266, 268 (6th Cir. 1990) ("It is undisputed that the impetus to [EMTALA] came from highly publicized incidents where hospital emergency rooms allegedly . . . failed to provide a medical screening that would have been provided a paying patient, or transferred or discharged a patient without taking steps that would have been taken for a paying patient."); see also 131 Cong. Rec. S13,892-01 (1985) (remarks of Sens. Durenberger, Kennedy, Dole, Baucus, Heinz, and Proxmire, emphasizing that the source of EMTALA was the widely reported scandal of emergency rooms' increasingly dumping indigent patients from one hospital to the next while the patients' emergency conditions worsened). Once EMTALA has met that purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians. And, the legal adequacy of that care is then governed not by EMTALA but by the state malpractice law that everyone agrees EMTALA was not intended to preempt. That being the legal

5

reality, there is no justification for Bryan's assertion that, under such a reading of EMTALA, "a hospital could simply treat for a few days or hours and then refuse treatment if they could not stabilize quickly and cheaply." Appellant's Brief at 7. Such refusal of treatment after the establishment of a physician-patient relationship would be regulated by the tort law of the several states. See , e.g., 61 Am. Jur. 2d, Physicians, Surgeons and Other Healers, § 234 ("[T]he relation of physician and patient, once initiated, continues until it is ended by the consent of the parties . . . or until his services are no longer needed, and until then the physician is under a duty to continue to provide necessary medical care to the patient."), § 238 ("Failure of the patient to pay for the physician's services does not justify the physician in abandoning the patient while he still is in need of medical attendance . . . .") (1981). And, EMTALA is quite clear that it is not intended to preempt state tort law except where absolutely necessary. See 42 U.S.C. § 1395dd(f) (mandating that EMTALA preempt no state law requirement "except to the extent that the requirement directly conflicts with a requirement of [EMTALA]"). Such reprehensible disregard for one's patient as Bryan hypothesizes would not constitute the "dumping" at which EMTALA aims but the well established tort of abandonment, which the states may expand or constrict as they deem just but which Congress evidenced no desire to federalize. Presumptively aware of this feature of state tort law, Congress did not address a hypothetical problem that was not before it but addressed a national scandal that was: emergency rooms' turning away patients at the door for inability to pay or other similar reasons.

EMTALA seeks to achieve the limited purpose of its enactment by requiring that the hospital provide limited stabilizing treatment to or an appropriate transfer of any patient that arrives with an emergency condition. 42 U.S.C. § 1395dd(b)(1);*see also Vickers, 78 F.3d at 142. And it defines "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the

_____

*The Act also requires that every hospital provide an appropriate screening to every patient who comes to its emergency department and determine whether the patient, in fact, has an emergency medical condition. 42 U.S.C. § 1395dd(a). But there is no claim in this case that the hospital violated the screening requirement.

6

condition is likely to result from or occur during the transfer of the individual . . . ." 42 U.S.C. § 1395dd(e)(3)(A). The stabilization requirement is thus defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system. It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment. It cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context.

To resist this conclusion, Bryan relies entirely on our decision in In the Matter of Baby "K", 16 F.3d 590 (4th Cir. 1994), cert. denied, 115 S. Ct. 91 (1994), but that decision is fully consistent with our interpretation of the Act here. The patient in issue in Baby K was an anencephalic infant suffering, when presented for admission, from respiratory distress. The hospital sought a declaratory judgment that under those circumstances its prevailing standard of care for anencephalic infants should provide the standard for its compliance with EMTALA's requirement of stabilization of the patient's respiratory distress. We rejected that contention, holding that EMTALA's stabilization requirement is focused upon the patient's emergency medical condition, not her general medical condition. Under the circumstances, the requirement was to provide stabilizing treatment of the condition of respiratory distress, without regard to the fact that the patient was anencephalic or to the appropriate standards of care for that general condition.

The holding in Baby K thus turned entirely on the substantive nature of the stabilizing treatment that EMTALA required for a particular emergency medical condition. The case did not present the issue of the temporal duration of that obligation, and certainly did not hold that it was of indefinite duration.

III.

There remains the question whether under this interpretation of the critical provision of EMTALA, Bryan's complaint states a claim

7

under that statute. Though dismissal under Fed. R. Civ. P. 12(b)(6) is proper only if a court can conclude that on the claim as pleaded the claimant could prove no set of facts that would entitle her or him to relief, Labram v. Havel, 43 F.3d 918, 920 (4th Cir. 1995), we do so conclude here.

Bryan's complaint alleges no EMTALA violation on the part of the hospital at any time before Mrs. Robertson had been in the hospital for twelve days. The only actions by the hospital that are alleged as violations of EMTALA began on February 17 with the entry of the anti-resuscitation order and ended on February 25 with the hospital's failure to prevent Robertson's death. As Bryan has expressly conceded on appeal, the complaint therefore must be taken to admit that Mrs. Robertson actually received stabilizing treatment in accord with EMTALA for twelve days following her admission and to confine the claim of violation only to the ultimate cessation of that or any further medical treatment upon entry of the anti-resuscitation order. Appellant's Brief at 6.

So constrained in legal theory, Bryan could, under our interpretation of the limits of the stabilization treatment obligation, "prove no set of facts that would entitle her to relief." Whether the conduct alleged may have violated other law is not before us. We hold only that it did not violate EMTALA, and that the district court did not, therefore, err in dismissing the claim as alleged.

AFFIRMED

8