THIRD DIVISION

December 18, 2002

No. 1-01-4210

EARLEAN JINKINS, INDIVIDUALLY and as ) Appeal from the

ADMINISTRATOR of the ESTATE OF GEORGE ) Circuit Court of

JINKINS, DECEASED, ) Cook County. 

) 

Plaintiff-Appellant, )

) 

v. ) 

)

EVANGELICAL HOSPITALS CORPORATION, )

d/b/a EHS CHRIST HOSPITAL AND MEDICAL )

CENTER, a/k/a CHRIST HOSPITAL AND )

MEDICAL CENTER; DR. SEAN E. MOTZNY; )

DR. DAN SACHS; L. KEMP; AND ROBERT )

HARWOOD, M.D., ) Honorable

) Martin S. Agran,

Defendants-Appellees. ) Judge Presiding.

JUSTICE WOLFSON delivered the opinion of the court:

In this medical negligence case, personnel at the defendant hospital transferred the patient to a State medical facility, where he was examined and released.  One hour later, he committed suicide.  The question is whether the defendant hospital and its personnel can be held liable for that suicide.  The trial judge granted summary judgment on behalf of the defendants.  We affirm the trial court.    

FACTS 

George Jinkins' friend, Lorenzo Norwood, testified in a deposition that for several months before the suicide, George had begun drinking heavily.  He was wearing dirty clothes, giving away money and possessions, and jumping in front of cars.  George had separated from his wife, Earlean, who was living elsewhere with their children.  On June 20, 1996, Maurice Abernathy, another friend, found George lying face-down in a puddle of muddy water.  He was bleeding and his pants were pulled down.  After they brought him home, George jumped in front of another car.  Norwood, Abernathy, and George's mother, Florine Jinkins, brought him to the emergency room at Christ Hospital and Medical Center (Christ Hospital) at about 7 p.m.  

At the hospital, George's blood alcohol level was .203, and he tested positive for marijuana.  Dr. Daniel Sachs diagnosed George with acute psychosis, suicidal behavior, and alcohol intoxication.  A petition for involuntary admission was prepared and signed by George's mother.  In a certificate attached to the petition, Dr. Sachs said, in his opinion, George was mentally ill and because of his illness was reasonably expected to inflict serious physical harm on himself or another in the near future.  He based that opinion partially on statements by family members that George repeatedly tried to kill himself by walking into the street in front of cars and told them, "I just want to go."  According to Dr. Sachs' notes and hospital records, George had been hearing voices and "seeing colors."  He thought his mother was poisoning his food and people were shooting at him. 

Leonard Kemp, a social worker at Christ Hospital, informed Dr. Sachs of the decision to transfer George to Madden Mental Health Center (Madden), a state facility.  Dr. Sachs stated in his deposition that this decision was "administrative," and he was not involved in the decision.  He told Kemp he thought George should either be involuntarily transferred or involuntarily evaluated by a psychiatrist.  The plaintiff contends George was transferred to Madden because he did not have health insurance.  Dr. Sachs stated he did not know the reason for transfer, but insurance "may have been a factor."  Dr. Sachs said he spoke on the telephone to a "Dr. Jazed"
(footnote: 1) at Madden regarding George's condition.  

George was not transferred immediately because his alcohol level upon arrival at Christ Hospital was too high.  A psychiatrist at Madden testified it was the facility's policy not to accept a patient until his blood alcohol level dropped below .1.  

While at Christ Hospital, George was placed in leather restraints, was agitated, and kept screaming, "Get me out of here."  He "laughed inappropriately" when blood was drawn from his arm.  At 11:40 p.m., he was given ten milligrams of Haldol, a medication used to calm combative patients.  At 2:50 a.m., he ran out of the emergency room during a trip to the restroom.  He was found in a parking lot a half-hour later and brought back to the hospital.  

At 5:50 a.m., George was transported to Madden by ambulance and arrived at 7:30 a.m.  The record shows he was interviewed and evaluated by both Dr. Lee and Medlin.  It was Dr. Lee's decision as an intake psychiatrist whether or not to admit a patient involuntarily.  George was accompanied by his mother, Florine, and his wife, Earlean.  Dr. Lee and Medlin reviewed records from Christ Hospital stating George had been hearing noises and voices, thought he was being shot at, thought birds were talking to him, and that he had been poisoned.  They also were aware that George had been running in front of cars trying to kill himself, but did not know he was found lying in a puddle of water.  They knew of his testing positive for marijuana.

During the interview, George was calm and coherent and displayed no paranoid symptoms.  He denied all of the behaviors listed in the Christ Hospital records, and denied being suicidal or depressed.  He denied any past psychiatric history or past suicide attempts.  He said he did not want to be admitted to Madden.  Earlean and Florine both stated he did not need to be admitted to Madden.  Earlean stated she did not witness any suicidal behavior by George and did not think he was suicidal.  She said she and George had been separated for a few days, but were now back together.  

Based on these interviews, Dr. Lee and Medlin released George and referred him for outpatient treatment for alcohol abuse.  George refused the referral.  Dr. Lee diagnosed George with alcohol-related disorder NOS (not otherwise specified), and alcohol abuse.  In his deposition, Dr. Lee stated he did not believe George was suicidal, but there was a low risk of suicide.  His decision to release George was based on George's strong statement that he did not want to be admitted, his wife's and mother's objections to his being admitted, and his "supportive family network."  George was released from Madden at approximately 9:50 a.m. on June 21, 1996.  Within an hour of arriving home, George shot himself in the head and later died of his injuries.

Earlean brought an action against Christ Hospital and its employees for providing negligent treatment.  She also alleged Christ Hospital violated the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (1994), by failing to stabilize the patient before transferring him to Madden.
(footnote: 2)    

Defendants brought a motion for summary judgment, contending that plaintiff's expert witness was not competent to establish the applicable standard of care because he was not licensed in the same profession as the defendants.  Defendants also contended their actions were not a proximate cause of Jinkins' death and did not violate EMTALA. 

DECISION

On appeal, plaintiff contends the trial court erred in granting summary judgment for the defendants because her expert, Dr. Henry Lahmeyer, M.D., established the applicable standard of care for the defendants.  She seeks to use the deposition testimony of Dr. Lahmeyer to establish the standard of care. Regardless of whether plaintiff's expert was qualified to testify, we find plaintiff has failed to establish the defendants' alleged negligent conduct proximately caused her husband's death.

A motion for summary judgment should be granted only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  735 ILCS 5/2-1005(c)(West 2000); 
Petrovich v. Share Health Plan of Illinois, Inc.
, 188 Ill. 2d 17, 30-31, 719 N.E.2d 756 (1999).  We conduct a 
de
 
novo
 review of a grant of summary judgment
.  
Morris v. Margulis
, 197 Ill. 2d 28, 35, 754 N.E.2d 314 (2001).    

In a negligence medical malpractice action, the plaintiff has the burden of proving the following elements: (1) the proper standard of care for the defendant physicians; (2) an unskilled or negligent failure to comply with the appropriate standard; and (3) a resulting injury proximately caused by the physicians' failure of skill or care.  
Purtill v. Hess
, 111 Ill. 2d 229, 241-42, 489 N.E.2d 867 (1986).  Expert medical testimony generally must be used to establish the three elements.  
Addison v. Whittenberg
, 124 Ill. 2d 287, 297, 529 N.E.2d 552 (1988).  

Proximate cause is composed of two separate elements: cause in fact and legal cause.  
First Springfield Bank & Trust v. Galman
, 188 Ill. 2d 252, 257-58, 720 N.E.2d 1068 (1999), citing 
Lee v. Chicago Transit Authority
, 152 Ill. 2d 432, 455, 605 N.E.2d 493 (1992).  To establish cause in fact, there must be a reasonable certainty that a defendant's acts caused the injury.  A defendant's conduct is the cause in fact of the injury if the conduct was a material element and a substantial factor in bringing about the injury.  
Lee
, 152 Ill. 2d at 455.  Legal cause "'is essentially a question of foreseeability: a negligent act is a proximate cause of an injury if the injury is of the type which a reasonable man would see as a likely result of his conduct.'" 
Lee
, 152 Ill. 2d at 456, quoting 
Masotti v. Console
, 195 Ill. App. 3d 838, 845, 552 N.E.2d 1292 (1990).  Where there is an intervening act by a third person, the test we apply is whether the first wrongdoer reasonably might have anticipated the intervening cause as a natural and probable result of the first party's own negligence.  
Galman
, 188 Ill. 2d at 257.  

The parties dispute whether Dr. Lahmeyer is competent to testify to the standard of care for the defendants.  We will assume he is competent and all of the deposition testimony is admissible.  Even accepting all of Dr. Lahmeyer's testimony as true, the plaintiff fails to establish a factual claim that the defendants' alleged negligence proximately caused George's death.  

In his deposition taken on February 19, 1999, Dr. Lahmeyer testified, in his opinion, the emergency department staff or social work staff did not adequately obtain George's medical history and inadequately supervised him while at the hospital.  Dr. Lahmeyer also testified George was not "medically stable" at the time of transfer and needed to be observed for a longer period of time.  Dr. Lahmeyer said he would have expected the physicians at Madden to admit the patient.  

The following testimony was elicited during a second deposition of Dr. Lahmeyer on April 6, 2001:

"Q. Is it your opinion that George needed to be evaluated by a psychiatrist?

A. At Christ?

Q. At Christ.

A. It's my opinion that a psychiatrist should have been consulted, you know, should have been called.*** 

Q. So you think a reasonably well-qualified emergency room physician, under these circumstances, was required to have contacted, minimally, a psychiatry resident or at least a psychiatry attending at Christ Hospital?

A. Well, that's commenting on the procedures of ER docs, which is really not my expertise, and I don't know their guidance.  You know, I read a little bit in their depositions about their training and so forth.  I think I stated last time that I don't want to comment about, you know, specifically the standard of care for ER doctors.  I can say what I would do; you know, if I had been a psychiatrist and being called, I can say a lot of things that I would be very alarmed about, but, you know, they have separate training, they have separate attendings.  I'd rather not get into that.

Q. Okay.  As a psychiatrist in looking at this case in its entirety, is it your opinion that Mr. Jinkins should have been evaluated by a psychiatrist?

A. Yes.

Q. And is it your opinion, then, a reasonably well-qualified psychiatrist would have recommended admission to a hospital to evaluate and treat the psychosis?

A. Yes." 

 All that Dr. Lahmeyer's testimony establishes is that in his opinion, the defendants breached their standard of care. Nowhere in his testimony does he make a causal connection between the conduct of the physicians at Christ Hospital and George Jinkins' subsequent suicide.  Moreover, it is apparent from the record that the physicians at Christ Hospital expected George to be admitted to Madden and did not foresee his release from the Madden facility.  In his deposition on October 30, 1998, Dr. Sachs testified as follows:  

"Q. Did you consider the possibility--when you were talking to George and his family, did you consider the possibility that the patient might wind up at home within the next 12 hours?

A. No. I did not think that would happen.

Q. And why didn't you think that would happen?

A. Because he had demonstrated suicidal behavior over the course of three weeks, consistent attempts to kill himself over the course of three weeks, and had made comments like, I just want to go. Patients like that, we don't discharge home.

***

Q. Did you learn that he was--when you learned that he had killed himself, did you learn that he had killed him--he was not under institutional care when he killed himself? Or did you make that inference?

A. Well, I made that inference.

Q. Was that a surprise to you that he was not under institutional care–

A. Yes.

Q. --within just 12 hours after seeing him?

A. Yes, it was a surprise to me.

Q. Was it a surprise to you because George needed to be admitted to a hospital?

A. It was a surprise to me because George needed supervised psychiatric care.

Q. And it was a surprise to you that he didn't get it?

A. Yes." 

The plaintiff is unable to establish the defendants' conduct was the proximate cause of George's death, because the defendants could not reasonably have foreseen that he would be released from Madden and commit suicide.  The release of George from Madden was a sufficient intervening act to break the causal connection between the defendants' conduct and George's death.  There is no liability for a party's negligent act unless the negligent act was the proximate cause of the injury suffered.  
Madden v. Kuehn
, 56 Ill. App. 3d 997, 1000, 372 N.E.2d 1131 (1978).  It is not conceivable that the defendants could be held responsible for George's death where they transferred the patient to Madden and informed the Madden staff of the patient's history.  See 
Madden
, 56 Ill. App. 3d at 1000 (in medical malpractice case for death of an inmate, sheriff was not liable for proximately causing decedent's death when he turned decedent over to the Department of Corrections and informed Department of his condition).       Plaintiff contends George would not have died if the defendants had kept him at Christ Hospital and had not transferred him to Madden.  This is essentially a "but for" argument reaching only to the issue of cause in fact and not legal cause.  The plaintiff fails to show the defendants reasonably might have anticipated that Madden would release George as a probable result of their negligent acts.     

Because the plaintiff fails to offer any factual allegations that, if true, would establish proximate cause, we find the trial court properly granted summary judgment.  The element of proximate cause is ordinarily a question of fact for the jury; however, summary judgment is appropriate where the facts are undisputed and there is no difference in the judgment of reasonable men as to the inferences to be drawn.  
Williams v. University of Chicago Hospitals
, 179 Ill. 2d 80, 88-89, 688 N.E.2d 130 (1997); 
McCoy v. McCoy
, 227 Ill. App. 3d 244, 248, 591 N.E.2d 124 (1992).  Although it appears the trial court granted summary judgment on bases other than proximate cause, we may affirm on any basis appearing in the record.  
Material Service Corp. v. Department of Revenue
, 98 Ill. 2d 382, 387, 457 N.E.2d 9 (1983).  

The plaintiff also contends Christ Hospital violated EMTALA, 42 U.S.C. § 1395dd (1994), by transferring George to Madden without first stabilizing his condition.  EMTALA is a limited "anti-dumping" statute, not a federal malpractice statute.  
Bryan v. Rectors and Visitors of the University of Virginia
, 95 F.3d 349, 351 (4th Cir. 1996).  Its "core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat."  
Bryan
, 95 F.3d at 351.  The Act requires a hospital to provide limited stabilizing treatment to, or an appropriate transfer of, any patient who arrives with an emergency medical condition.  42 U.S.C. § 1395dd(b)(1) (1994).  The hospital must stabilize the patient before transfer. 42 U.S.C. § 1395dd(c) (1994).  To "stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result or occur during the transfer of the individual from a facility."  42 U.S.C. § 1395dd(e)(3)(A).  

In the instant case, the plaintiff fails to present any evidence the hospital violated the requirements of EMTALA by failing to stabilize the patient before transfer within the meaning of the Act.  The following testimony was elicited during Dr. Lahmeyer's deposition on April 6, 2001:

"Q. What was George's condition at the time of his discharge from Christ?

A. George's condition was that he was still acutely psychotic, he was in restraints, he had received 10 milligrams of Haldol, he was in, you know, a little bit more serious denial about his mental illness. He was denying, you know, all kinds of psychotic symptoms, because he basically just wanted out of there.  And he had just tried to run away at 3:30 a.m., so he was acutely psychotic and probably trying to run away to kill himself.

Q. And do you have any information about George's condition during the period of transport from Christ to Madden?

A. My understanding from everything I've read is that he was fine.

Q. Had his condition changed at all from the time of discharge from Christ up to the time he arrived at Madden? Was he still acutely psychotic and in denial?

A. Yeah.

Q. And when he arrived at Madden, his condition was the same?

A. As when he left?

Q. When he left Christ.

A. Yeah, he may have–-I don't know.  He was out of restraints there, and I don't know when his wife actually arrived.  I think she arrived in the middle of the night at Christ, but I remember from [Dr. Choong Lee's] deposition they were on the sofa, hugging.  So, you know, he probably felt a little calmer with his wife being there.  I saw the comment that he, you know, appeared calm on the sofa.

Q. You mentioned the Haldol –

A. But basically, to answer your question, the psychosis hadn't changed."

Based on Dr. Lahmeyer's testimony, the plaintiff has not offered any evidence that George's condition deteriorated as a result of his transfer to Madden.  According to the testimony, George was in the same or better condition upon arriving at Madden than when he left Christ Hospital.  In her reply brief, the plaintiff contends deterioration of George's condition is shown by the fact that "[w]ithin four hours of being sent away by the Defendant, Jinkins had a self inflicted bullet wound to his head which caused his death."  Plaintiff's contention misconstrues the purpose of the Act.  The Act does not require a hospital to completely alleviate a patient's emergency condition; all that is required is to refrain from transferring a patient until he is "stable."  
Brooker v. Desert Hospital Corp.
, 947 F.2d 412, 415 (9th Cir. 1991).  It is clear from the record that defendant acted reasonably in stabilizing George within the meaning of the Act before his transfer.  

We also find summary judgment was appropriate because plaintiff is unable to prove proximate cause with regard to her EMTALA claim.  EMTALA allows plaintiffs to recover any damages they are entitled to under state law as a result of a hospital's failure to comply with the Act.  42 U.S.C. § 1395dd(2)(A) (1994).  A plaintiff is required to show the patient's injury was proximately caused by the defendant's violation of EMTALA.  See 
Tolton v. American Biodyne, Inc.
, 48 F.3d 937, 944 (6th Cir. 1995).  Here, the plaintiff is unable to establish the requisite causal connection between the hospital's conduct and the patient's death.  Summary judgment is appropriate on the EMTALA claim.  

CONCLUSION      

We affirm the decision of the trial court.

Affirmed.

SOUTH, P.J., and HALL, J., concur.

FOOTNOTES
1:
According to both parties, the name of the physician at Madden was Dr. Javed.  Dr. Javed was not present when the patient was examined at Madden.  

2:
The plaintiff also brought suit against two Madden employees, Dr. Choong Lee and Paulette Medlin, for releasing George from Madden.  That case is being decided in a separate appeal, No. 1-01-3937.