Victor **MAZURKIEWICZ** and Mary Mazurkiewicz Plaintiffs

v.

**DOYLESTOWN HOSPITAL** and Daniel Nesi, M.D. Associates, P.C. Defendants

No. 01–CV–5418.

United States District Court, E.D. Pennsylvania.

Feb. 17, 2004.

---

Aaron J. Freiwald, Layser & Freiwald PC, Philadelphia, PA, for Plaintiffs.

Joan Orsini Ford, Marshall, Dennehey, Warner, Coleman & Goggin, Doylestown, PA, Kevin H. Wright, Kevin H. Wright & Assoc., Conshohocken, PA, for Defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

On October 25, 2001, plaintiffs Victor Mazurkiewicz ("Mazurkiewicz") and his wife Mary Mazurkiewicz filed this action against defendant Doylestown Hospital ("Doylestown") and several individual doctors affiliated with the hospital. Plaintiffs alleged state negligence claims and violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd(b). On July 18, 2002, I denied Doylestown's motion to dismiss.[1] Doylestown has now moved for summary judgment on plaintiffs' claim under EMTALA.[2] The court has subject matter ju-

1. In that same order, I denied defendants Alane Beth Torf and David Loughran's motions to dismiss. Douglas Nadel and Daniel Nesi M.D. Associates's motions to dismiss were granted in part and denied in part. Since that time, the claims against Alane Beth Torf and David Loughran have been dismissed with prejudice (Docket # 28 and Docket # 33 respectively).

2. In its reply brief, defendant Doylestown argues for the first time that plaintiffs have failed to establish a claim of medical malpractice or a claim of corporate negligence. Plaintiffs have not responded to defendant's

risdiction over this case based on the existence of a federal question.

### Factual Background

On February 19, 2001, Mazurkiewicz arrived at the Emergency Department of Doylestown Hospital.[3] Dr. Harold Feiler, an emergency room physician, examined Mazurkiewicz and determined that his symptoms of sore throat, sinus pressure, swollen glands, achiness, painful swallowing and trouble breathing were indicative of right peritonsilar abscess. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. B.) Dr. Feiler called in Dr. Douglas Nadel, an ear, nose and throat specialist. Dr. Nadel ordered a CT scan, which indicated "severe pharyngitis, possible abscess." Dr. Nadel interpreted this result as "negative for a definite abscess." (Nadel Dep. at 82.) In addition to the CT scan, Dr. Nadel performed a fine needle aspiration, which he described as the "gold standard for ruling in or ruling out an abscess." (Id. at 56.) Dr. Nadel performed the aspiration partly for diagnostic purposes and partly "for treatment and to obtain a bacteria for culture if there is an abscess." (Id.) Dr. Nadel was unable to aspirate any fluid for a culture. Dr. Nadel considered the aspiration "as conclusive as clinically possible" in ruling out the possibility that Mazurkiewicz had an abscess. (Id. at 83.)

Despite his position that his patient did not have an abscess, Dr. Nadel's physician orders indicate Mazurkiewicz's diagnosis as "Parapharyugeal Abscess." (Pls.' Resp. Def.'s Mot. Summ. J. Ex. C.) Dr. Nadel maintains, however, that Mazurkiewicz did not have an abscess on February 19, 2001, nor at any point while he was hospitalized at Doylestown. Dr. Nadel explained in his deposition that he listed parapharyugeal abscess as the diagnosis "because [he] wanted [Mazurkiewicz] hospitalized out of [Dr. Nadel's] concern for [Mazurkiewicz] developing an abscess. But again, at no point during his hospitalization did he have a definite abscess." (Nadel Dep. at 90.)

Dr. Nadel testified that a neck abscess is a potentially life-threatening condition, and that he did not even consider discharging Mazurkiewicz from the Emergency Department on the night he was admitted to the hospital. (Id. at 17, 136.) Because Dr. Nadel admitted Mazurkiewicz to Doylestown Hospital for "airway observation," Mazurkiewicz was put in the Intensive Care Unit with continuous pulse oximetry and with a tracheotomy tray kept at his bedside. (Id. at 68.) Dr. Nadel discussed the pros and cons of performing a tracheostomy with Mazurkiewicz, but Dr. Nadel did not perform a tracheostomy. (Mazurkiewicz Dep. at 54, Nadel Dep. at 66.)

Mazurkiewicz remained hospitalized for five days until his release on February 24, 2001. During this time he received IV antibiotics and an infectious disease specialist was consulted. (Nadel Dep. at 81, 89.) Dr. Nadel's notes and his deposition testimony suggest that Mazurkiewicz made steady improvement throughout his admission.

On February 20, Dr. Nadel noted "less odynophagia"[4] but that his patient's neck

---

argument on this claim. Because Doylestown failed to raise this argument in its initial motion for summary judgment, plaintiffs were not obligated to provide evidence in support of the claims for medical malpractice or corporate negligence. These claims therefore are not ripe for determination at this stage.

3. Because defendant moves for summary judgment, the facts are set forth in the light most favorable to plaintiff. *See Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir.1997).

4. Odynophagia: pain on swallowing. STEDMAN'S MEDICAL DICTIONARY 27th ed. (2000).

was "still tender." Dr. Nadel also noted "parapharyngeal cellulitis/early abscess" on February 20th, and wrote that he would consider re-aspirating Mazurkiewicz on the following day if his white blood cell count remained elevated. (*Id.* at 109.)

On February 21, Dr. Nadel noted that his patient had "much less odynophagia" and that he found Mazurkiewicz's condition "to be somewhat improved." (Pls.' Resp. Def.'s Mot. Summ. J. Ex. B, Nadel Dep. at 119.) In response to a question about whether Dr. Nadel thought on February 21 that Mazurkiewicz was developing an abscess, the doctor testified, "It [was] still a possibility, but his overall clinical picture was beginning to improve," and that, "[i]f he had shown any signs of worsening, I would have repeated his aspiration." (Nadel Dep. at 121, 125.)

On February 22, Dr. Nadel observed "significantly improved odynophagia" and "much less hoarseness." Dr. Nadel also noted that his patient was "clinically much improved [after] 2½ days of Timentin (IV antibiotics)." At that point, Dr. Nadel's plan was to continue the Timentin and if there was continued improvement the next day, he would discharge Mazurkiewicz. (Pls.' Resp. Def.'s Mot. Summ. J. Ex. B.)

On February 23, Dr. Nadel noted "[c]ontinued decrease in right pharyngeal bulge." (Nadel Dep. at 128.) Dr. Nadel then made the decision to continue the Tementin one more day and to discharge his patient if there was continued clinical improvement. (*Id.* at 129.)

On February 24 at 9:30 a.m., Dr. Nadel noted "continued decrease in odynophagia but now with some new findings." Dr. Nadel believed that these new findings (ear pain, right facial pain, nasal congestion, and green nasal discharge) were symptoms of an acute sinus infection. (*Id.* at 130.) Mazurkiewicz was discharged from Doylestown on February 24, 2001 at

12:45 p.m., with instructions to contact Dr. Nadel if his symptoms worsened. (*Id.* at 134.)

Although Dr. Nadel consistently noted in Mazurkiewicz's patient records that he would re-aspirate his patient if necessary, he did not attempt to aspirate Mazurkiewicz again after the initial attempt on February 19, 2001. Dr. Nadel also did not repeat his examination of Mazurkiewicz with a laryngoscope, nor did he order another CT scan. (Pls.' Resp. Def.'s Mot. Summ. J. at 3.) Dr. Nadel testified that he "did not think at any time that it was appropriate to obtain" another CT scan. (Nadel Dep. 75.)

According to Mazurkiewicz, he was in pain and had tenderness on the right side of his neck throughout his admission until his discharge, and he complained of increased discomfort on the right side of his neck and throat on the morning of his discharge. (Pls.' Resp. Def.'s Mot. Summ. J. 2–3.)

After returning home on February 24, 2001, Mr. Mazurkiewicz developed a fever. (Mazurkiewicz Dep. 61.) Mrs. Mazurkiewicz suggested going to Hunterdon Medical Center, where she worked, instead of returning to Doylestown Hospital. Mr. and Mrs. Mazurkiewicz arrived at Hunterdon at 8:17 p.m. According to Mazurkiewicz, upon presentation to the Hunterdon Emergency Room, he had a "fever of nearly 102 [degrees], dysphagia and restriction of neck motion". (Pls.' Resp. Def.'s Mot. Summ. J. at 3.) No facts are in evidence about plaintiff's treatment at Hunterdon, but the following account is in plaintiff's brief:

A CT scan was performed, which showed right parapharyngeal space abscess with probable retropharyngeal space involvement. Mr. Mazurkiewicz was taken urgently to the operating

room for emergency securing of his airway and for surgical drainage of the abscess. During surgery, it was determined that a tracheotomy was necessary to protect Mr. Mazurkiewicz's airway, given the extensive neck swelling and inability otherwise to secure his airway. Mr. Mazurkiewicz was discharged from Hunterdon Medical Center on March 3, 2001.

Pls.' Resp. Def.'s Mot. Summ. J. at 3.[5]

Mazurkiewicz has submitted two medical opinions in support of his position that he actually had an abscess while at Doylestown. Dr. Donald Kent, described by plaintiff as a "board certified ear, nose and throat physician," opined in a letter to plaintiffs' counsel:

> I believe that Mr. Mazurkiewicz was not adequately and appropriately evaluated by Dr. Nadel during his entire Doylestown Hospital stay. No fiberoptic evaluation and no follow up CT of the neck were obtained, two clearly, commonly accepted tools used by otolaryngologists in the evaluation and treatment of orophayngeal cellulites, neck abcess and airway obstruction.
>
> Dr. Nadel, on page 133 of his deposition, states that the abcess (sic) that did require emergent (sic) tracheostomy and drainage was not present upon his discharge from Doylestown Hospital on February 24, 2001. This is a statement that surely cannot be valid, as Dr. Nadel has no supporting laboratory, fiberoptic or radiologic evident (sic) that this was indeed the case. In actually (sic), the abcess was steadily enlarging.
>
> Thus this patient was discharged with persistent infection and abcess that led to emergent (sic) life saving surgery just

twelve hours later at another hospital. The emergency tracheostomy subsequently performed should have and could have been avoided.

(Pls.' Resp. Def.'s Mot. Summ. J. Ex. E.)

Plaintiffs have also submitted an affidavit from Dr. Nancy J. Ferguson, a physician board certified in both family medicine and emergency medicine. Dr. Ferguson stated that she "reviewed the medical records relating to Victor Mazurkiewicz from Doylestown Hospital and Hunterdon Medical Center," and that "[w]hen Mr. Mazurkiewicz sought treatment at Doylestown Hospital on February 19, 2001, first in the emergency department and then during his several-day admission there, he had a life-threatening, emergency medical condition, namely a large parapharyngeal space abscess." (Pls.' Resp. Def.'s Mot. Summ. J. Ex. F.) Dr. Ferguson went on to opine that, "Mr. Mazurkiewicz was discharged from Doylestown Hospital on February 24, 2001 without stabilizing his emergency medical condition." Dr. Ferguson concluded, "[b]ased on my training and experience as an emergency department physician and my review of the pertinent medical records, it is my professional opinion that Doylestown Hospital and the physicians caring for Mr. Mazurkiewicz there failed to meet their obligations under EMTALA by failing to stabilize Mr. Mazurkiewicz's emergency medical condition prior to discharging him from the hospital." (Id.)

For the purposes of summary judgment, I accept all the medical conclusions proferred by the plaintiffs. However, whether Mazurkiewicz was "stabilized" under EMTALA becomes solely a legal conclusion.

---

5. Dr. Nadel testified that he believed Mazurkiewicz had stabilized at the time of his discharge on February 24, 2001. (Nadel Dep. 136.) Dr. Nadel believes that Mazurkiewicz developed the abscess "sometime between discharge from Doylestown Hospital and at presentation to the Hunterdon Medical Center ER." (Id. at 133.)

### Discussion

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). My inquiry in deciding Doylestown's motion for summary judgment is a narrow one. I am not being called upon to decide the truth of either side's story or to determine what the facts are, for those are the functions of the jury. Rather, under the Federal Rules of Civil Procedure, my task in deciding this motion for summary judgment is to focus solely on the evidence supporting the Mazurkiewczs' case and to determine whether it is sufficient to require a trial. This task requires me to resolve two questions, the first being whether the evidence supporting the Mazurkiewiczs' case would be admissible at trial under the Federal Rules of Evidence, and the second being whether, assuming that all of their admissible evidence were true, that evidence would be legally sufficient to allow a jury to conclude that Doylestown had violated EMTALA. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the evidence supporting the Mazurkiewczs' case were insufficient to allow a jury to make that conclusion, a trial would be unnecessary and Doylestown would be entitled to summary judgment.

### EMTALA claim

Doylestown argues that it has not violated EMTALA and that plaintiffs' EMTALA claim should be dismissed. The relevant section of EMTALA states:

**Necessary stabilizing treatment for emergency medical conditions and labor**

**(1) In general**

> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—
>
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b).

There is no dispute between the parties that Mazurkiewicz went to Doylestown and that Dr. Nadel determined he had an emergency medical condition.

Mazurkiewicz argues that Doylestown is liable under EMTALA because he had an emergency medical condition that was not "stabilized" prior to his discharge. The term "stabilized" is defined in the statute as "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(B).[6] Plain-

---

**6.** The term "transfer" is defined in the statute as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person." The parties do not appear to dispute that Mazur-

tiffs contend that, because Mazurkiewicz was discharged with the same condition with which he was admitted and had to have emergency surgery less than eight hours after his release, he remained in a life-threatening condition for the entirety of his stay at Doylestown and was never stabilized as required by EMTALA.

The Third Circuit has not addressed the question of whether a plaintiff who has been admitted to a hospital (as opposed to discharged directly from the emergency room) can argue that he was never "stabilized," and thus seek relief under EMTALA.[7] However, cases from other circuits are instructive.

In *Bryan v. Rectors and Visitors of the Univ. of Va.*, 95 F.3d 349 (4th Cir.1996), the Fourth Circuit considered a claim brought under EMTALA by the estate of a woman who died after being treated for an emergency condition for twelve days. After these twelve days of treatment the hospital determined that no further efforts to prevent her death should be made. 95 F.3d at 350. The patient was allowed to die eight days later when she "faced a life-threatening episode." *Id.* The deceased patient's estate sued under EMTALA, claiming that the hospital had failed to stabilize the patient. *Id.* at 350–351.

The Fourth Circuit disagreed, and summarized plaintiff's position as arguing that "EMTALA imposed upon the hospital an obligation not only to admit Mrs. Robertson for treatment of her emergency condition, which concededly was done, but

thereafter continuously to 'stabilize' her condition, no matter how long treatment was required to maintain that condition. Such a theory requires a reading of the critical stabilization requirement in subsection (b)(1) of EMTALA that we cannot accept." *Id.* at 350.

The *Bryan* court went on to note the logical extension of such a stabilization requirement imposed by EMTALA:

> Under this interpretation, every presentation of an emergency patient to a hospital covered by EMTALA obligates the hospital to do much more than merely provide immediate, emergency stabilizing treatment with appropriate follow-up. Rather, without regard to professional standards of care or the standards embodied in the state law of medical malpractice, the hospital would have to provide treatment indefinitely—perhaps for years—according to a novel, federal standard of care derived from the statutory stabilization requirement. We do not find this reading of the statute plausible.

*Id.* at 351.

The court noted that EMTALA was not intended to be a federal malpractice suit, but rather a "limited anti-dumping statute" meant to "get patients into the system who might otherwise go untreated and be left without a remedy because traditional malpractice law affords no claim for failure

---

kiewicz was "transferred" within the meaning of EMTALA when he was discharged on February 24, 2001.

**7.** I discussed plaintiff's potential relief under EMTALA in a footnote in my Memorandum and Order denying defendant's motion to dismiss, issued July 18, 2002. I reviewed the case law holding that a patient who was admitted to a hospital after presenting herself at the emergency room cannot bring a claim

under § 1395dd(b). However, because the issue was not raised by any of the defendants at that point and as plaintiffs had not had an opportunity to address it, I declined to raise it *sua sponte* at that stage of the case. *Mazurkiewicz v. Doylestown Hosp.*, 223 F.Supp.2d. 661, 665 n. 1 (E.D.Pa.2002). I no longer am discussing this issue *sua sponte*, as the parties have raised it.

to treat." [8] *Id.* Indeed, "Congress's sole purpose in enacting EMTALA was to deal with the problem of patients being turned away from emergency rooms for non-medical reasons." *Id.* Perhaps most importantly, the court stressed that there is a remedy for the kind of action plaintiff alleged: state malpractice law. *Id.* ("Once EMTALA has met that purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians. And, the legal adequacy of that care is then governed not by EMTALA but by the state malpractice law that everyone agrees EMTALA was not intended to preempt.") [9]

The *Bryan* court further limited EMTALA's application by stating that:

It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment. It

cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context.

*Id.* at 352.

The Ninth Circuit adopted this reasoning to dismiss an EMTALA claim in *Bryant v. Adventist Health Sys.*, 289 F.3d 1162 (9th Cir.2002). In this case, the heirs of minor decedent David Bryant sued Redbud Community Hospital for violations of EMTALA at two different stages of Bryant's treatment. Bryant first went to the hospital because he had been coughing up blood and had a fever. 289 F.3d at 1164. A nurse examined Bryant and classified his condition as urgent. *Id.* The doctor who examined Bryant ordered a chest x-ray and blood tests, and failed to detect a large lung abscess on Bryant's x-ray, a condition which is considered an emergency medical condition. The doctor then misdiagnosed Bryant with only pneumonia and asthma and prescribed an antibiotic for the pneumonia. The medical staff was unable to give Bryant the full dose of the antibiotic because Bryant was agitated, but they determined that they "had injected a sufficient amount of the antibiotic to stabilize his pneumonia." *Id.*

8. *See also Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir.2001) ("Congress enacted EMTALA, commonly known as the 'Patient Anti–Dumping Act,' in response to the growing concern about the provision of adequate medical services to individuals, particularly the indigent and the uninsured, who seek care from hospital emergency rooms. Congress was concerned that hospitals were dumping patients who were unable to pay for care, either by refusing to provide emergency treatment to these patients, or by transferring the patients to other hospitals before the patients' conditions stabilized. *See* H.R.Rep. No. 241, 99th Cong., 1st Sess., Part I, at 27 (1985), reprinted in 1986 U.S.Code Cong. & Admin. News 579, 605 ('The Committee is greatly concerned about the increasing number of reports that hospital emergency rooms are refusing to treat patients with emergency con-

ditions if the patient does not have medical insurance.')"), *Harry v. Marchant*, 291 F.3d 767, 772–3 (11th Cir.2002), *Bryant v. Adventist Health Sys.*, 289 F.3d 1162, 1165 (9th Cir.2002).

9. Several other courts have also noted that EMTALA was not intended to be a federal malpractice statute. *See Harry*, 291 F.3d at 774, *Bryant*, 289 F.3d at 1166, *Reynolds v.MaineGeneral Health*, 218 F.3d 78, 83 (1st Cir.2000), *Marshall v. E. Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir.1998), *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir.1996), *Urban v. King*, 43 F.3d 523, 525 (10th Cir.1994), *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 143 (4th Cir.1996).

Bryant was then discharged at 2:30 a.m. because his condition appeared stable and his doctor and family agreed that he would be more relaxed at home. The doctor did, however, request that the family return with Bryant the following day. *Id.*

Later that day, as Bryant and his family prepared to return to the hospital, a hospital employee called and told them to return immediately because another doctor had diagnosed the lung abscess after reviewing Bryant's x-ray. *Id.* This doctor admitted Bryant to the hospital immediately upon his arrival. Bryant remained hospitalized for twenty-six days until his release. He then died "suddenly and unexpectedly" nine days later. Defendants moved for summary judgment on plaintiff's EMTALA claims, arguing that the medical staff was not required to stabilize the lung abscess when Bryant first arrived at the hospital because they had not yet detected it, and that once the hospital admitted Bryant, EMTALA no longer applied. The district court agreed with defendants and the Ninth Circuit affirmed. *Id.* at 1165, 1170.

With respect to the argument that Bryant's admission forbade EMTALA recovery, the court looked to the language of the statute and cited *Bryan*, 95 F.3d 349 for the proposition that "the term 'stabilize' was not intended to apply to those individuals who are admitted to a hospital for inpatient care." *Bryant*, 289 F.3d at 1167. The court explicitly held that "the stabilization requirement ends when an individual is admitted for inpatient care." *Id.* at 1168. Echoing the reasoning of the Fourth Circuit, the court reasoned that "[a]fter an individual is admitted for inpatient care, state tort law provides a remedy for negligent care." *Id.* at 1169.

A concurrence in the Eleventh Circuit also supports limiting EMTALA to cases where a patient has not been admitted. In *Harry v. Marchant*, 291 F.3d 767 (11th Cir.2002), the Eleventh Circuit considered the case of Lisa Normil, a patient who was brought to the emergency room by Fire Rescue and diagnosed with "pneumonia rule out sepsis." 291 F.3d at 768. The on-call physician on behalf of Normil's primary care provider refused to authorize Normil's admission into the intensive care unit ("ICU"), despite the emergency room physician's recommendation that she be admitted and the unavailability of a ventilation perfusion scan which the emergency room physician wanted to conduct. *Id.* at 768. Several hours later, Normil's regular primary care physician examined her and admitted her into the ICU. *Id.* After Normil's admittance into the ICU, she lapsed into respiratory and cardiac failure and died. *Id.* at 769. The court discussed the legislative history of EMTALA and the policy concerns it was meant to address. Because the language of the statute "mandates stabilization of an individual only in the event of a 'transfer'" and Normil was never transferred from the hospital, the court found that EMTALA could not apply to Normil's case. The court did not address the question of whether admittance itself barred liability under EMTALA, explaining in a footnote that:

> Additionally, interpreting EMTALA to require stabilization treatment outside the context of a transfer raises questions not answered by Congress, such as: when the duty to provide stabilization treatment terminates; if treatment is prolonged, and transfer is not imminent, *how long treatment must be provided;* and when the temporal delay between a determination of an emergency medical condition and the initiation of treatment constitutes a violation of a duty to provide stabilization treatment. Of course, such an interpretation would lead to the imposition of arbitrary limits, not sup-

ported by the statutory text, in an effort to fill the patent gaps of legislative direction.

*Id.* at 772 n. 11 (emphasis added).

Although the Eleventh Circuit did not discuss the significance of Normil having been admitted, Judge Rosemary Barkett wrote in a concurrence that she "agreed" that "because Lisa Normil was admitted as a patient, redress for negligence occurring during her emergency room care is available through state medical malpractice laws, rather than federal law." *Id.* at 775.

However, other circuit courts have refused to limit EMTALA to emergency room patients because patient dumping is unfortunately not limited to emergency rooms. *Lopez–Soto v. Hawayek,* 175 F.3d 170 (1st Cir.1999), *Thornton v. Southwest Detroit Hosp.,* 895 F.2d 1131 (6th Cir. 1990). In *Thornton,* the Sixth Circuit considered the EMTALA claim of Elease Thornton, who suffered a stroke and spent ten days in the hospital's intensive care unit and eleven more days in regular inpatient care. 895 F.2d at 1132. After these three weeks in the hospital, Thornton's doctor planned to admit her into the Detroit Rehabilitation Institute for post-stroke rehabilitation therapy. *Id.* The Institute rejected Thornton because her health insurance would not cover the cost, and Thornton's doctor discharged her to her sister's home for basic home nursing care. *Id.* While at her sister's home, Thornton's condition deteriorated until she was finally admitted to the Institute more than three months after being discharged from the hospital. Thornton sued the hospital under EMTALA, alleging that she suffered from an emergency medical condition when she entered the hospital and that the hospital failed to stabilize the condition before discharging her. *Id.* The district court found that "no genuine issue of material fact existed as to whether—

after a three week stay in the Hospital— Elease Thornton's condition had stabilized sufficiently for release. The district court stated that the Act was not intended to require hospitals to bring patients to complete recovery, but to require hospitals to give emergency room treatment." *Id.* at 1134.

■ The Sixth Circuit affirmed, but found that the language of the Act means that "once a patient is found to suffer from an emergency medical condition in the emergency room, she cannot be discharged until the condition is stabilized, regardless of whether the patient stays in the emergency room." *Id.* The court worried that limiting EMTALA's application to emergency rooms would allow hospitals to be relieved of EMTALA liability based on the technicality of where in the hospital a plaintiff had been treated. This outcome was unacceptable to the Sixth Circuit because "[a]lthough emergency care often occurs, and almost invariably begins, in an emergency room, emergency care does not always stop when a patient is wheeled from the emergency room into the main hospital." *Id.* at 1135. Thus, although the Sixth Circuit affirmed the district court's dismissal of the EMTALA claim, it stressed that the decision was "not based on the fact that Elease Thornton spent a 'prolonged period' in the Hospital, but on the district court's finding that no genuine issue of material fact existed as to whether her condition had stabilized at the time of her release." *Id.* This decision therefore stands for the proposition that "[h]ospitals may not circumvent the requirements of [EMTALA] merely by admitting an emergency room patient to the hospital, then immediately discharging that patient. Emergency care must be given until that patient's emergency medical condition is stabilized." *Id.* at 1135.

The First Circuit addressed this issue in dicta after considering another EMTALA issue which is not before me. The court discussed the legislative intent of EMTALA by noting that:

> Congress's preoccupation with patient dumping is served, not undermined, by forbidding the dumping of *any hospital patient* with a known, unstabilized, emergency condition. *After all, patient dumping is not a practice that is limited to emergency rooms.* If a hospital determines that a patient on a ward has developed an emergency medical condition, it may fear that the costs of treatment will outstrip the patient's resources, and seek to move the patient elsewhere. That strain of patient dumping is equally pernicious as what occurs in emergency departments, and we are unprepared to say that Congress did not seek to curb it.

*Lopez–Soto v. Hawayek*, 175 F.3d 170, 177 (1st Cir.1999) (emphasis added).

This interpretation notably contradicts the statutory language which specifically addresses "any individual" who "comes to a hospital" and is determined to have "an emergency medical condition." In *Bryant*, 289 F.3d at 1169, the Ninth Circuit considered this concern of hospitals "dumping" patients after admitting them and found that this exception to the rule of limiting EMTALA claims would only apply in very unique circumstances:

We agree with the Sixth Circuit that a hospital cannot escape liability under EMTALA by ostensibly 'admitting' a patient, with no intention of treating the patient, and then discharging or transferring the patient without having met the stabilization requirement. In general, however, a hospital admits a patient to provide inpatient care. *We will not assume that hospitals use the admission process as a subterfuge to circumvent the stabilization requirement of EMTALA.* If a patient demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's requirements, then liability under EMTALA may attach.

289 F.3d at 1169 (emphasis added).

■ Taking into consideration (1) the language "comes to a hospital" and a person who "has an emergency condition," (2) the legislative history of EMTALA cited by the Fourth Circuit in *Bryan*, and (3) the position of the First and Sixth Circuits that admission not be used as a subterfuge, the most persuasive synthesis of the law on admission as a defense to EMTALA liability is that admission is a defense so long as admission is not a subterfuge.[10]

■ Thus, given that Mazurkiewicz was admitted to the hospital for five days, to find Doylestown liable under EMTALA, I would have to find that he was deliberately admitted as a subterfuge. Mazurkiewicz

**10.** This is not, however, a requirement that bad faith be proven to recover under EMTALA. This idea was rejected by the Eighth Circuit which refused to focus the EMTALA inquiry on discriminatory purpose or bad faith: "One way of limiting the potentially sweeping scope of [EMTALA's] language is to require that a plaintiff prove some sort of improper motive in order to recover under EMTALA. As we have previously indicated, we do not agree that evidence of a purpose to 'dump' a patient is required." *Summers*, 91 F.3d at 1137. The court went on to hold that

lack of uniform treatment is a more appropriate inquiry: "So, if improper motive is not required, and if the statute does not create a federal remedy for medical malpractice in emergency rooms, what does the statute do? Something more than or different from negligence must be shown, but what is the 'something'? We have previously taken the position that the 'something' required is lack of uniform treatment ... It is up to the hospital itself to determine what its screening procedures will be. Having done so, it must apply them alike to all patients." *Id.* at 1138.

was admitted by Dr. Nadel with an emergency medical condition, and Dr. Nadel documented the improvement of that condition for the five days Mazurkiewicz remained at Doylestown. Plaintiffs have presented no evidence that Mazurkiewicz's admission was a subterfuge to avoid EMTALA liability. The EMTALA claim will be dismissed because Mazurkiewicz was admitted and there is no indication that this admission was done to avoid responsibility under EMTALA.

### ORDER

**AND NOW**, this    day of February, 2004, Defendant Doylestown Hospital's motion for summary judgment is **GRANTED**. Plaintiffs' claim under EMTALA is **DISMISSED**.