719 So.2d 1072 (1998)
Willie CAUSEY, Joe Cloman and Bernice Cloman, Plaintiffs-Appellants,
v.
ST. FRANCIS MEDICAL CENTER and Dr. Herschel R. Harter, Individually and as a Medical Corporation, Defendants-Appellees.
No. 30732-CA.
Court of Appeal of Louisiana, Second Circuit.
August 26, 1998.
*1073 Jeffrey D. Guerriero, for Appellants.
Bruce M. Mintz, Monroe, for Appellee St. Francis Med Center.
Jesse D. McDonald, Monroe, for Appellee Dr. Herschel Harter.
Before BROWN, WILLIAMS and GASKINS, JJ.
BROWN, Judge.
The facts of this end of life drama are not materially disputed. Believing it medically and ethically inappropriate, a physician and hospital withdrew life-sustaining care to a 31-year-old, quadriplegic, end-stage renal failure, comatose patient over the strongly expressed objections of the patient's family. As filed, this action was premised as an intentional battery-based tort. The trial court, however, found that defendants "acted in accordance with professional opinions and professional judgment" and thus this action was covered by the medical malpractice act which required that it first be presented to a medical review panel. Accordingly, the trial court dismissed the action as premature.

Facts
Having suffered cardiorespiratory arrest, Sonya Causey was transferred to St. Francis Medical Center (SFMC) from a nursing home. She was comatose, quadriplegic and in end-stage renal failure. Her treating physician, Dr. Herschel R. Harter, believed that continuing dialysis would have no benefit. Although Dr. Harter agreed that with dialysis and a ventilator Mrs. Causey could live for another two years, he believed that she would have only a slight (1% to 5%) chance of regaining consciousness. Because Mrs. Causey's family demanded aggressive life-sustaining care, Dr. Harter sought unsuccessfully to transfer her to another medical facility willing to provide this care.[1] *1074 Dr. Harter enlisted support from SFMC's Morals and Ethics Board. The Board agreed with Dr. Harter's opinion to discontinue dialysis, life-support procedures, and to enter a "no-code" status (do not resuscitate). Mrs. Causey was taken off a feeding tube and other similar devices. The day the ventilator was removed, Mrs. Causey died of respiratory and cardiac failure.
Plaintiffs, the husband, father and mother of Sonya Causey, brought this petition for damages against SFMC and Dr. Harter. Defendants filed an exception of prematurity asserting that this action was covered under Louisiana's Medical Malpractice Act, La. R.S. 40:1299.41 et seq., which requires that malpractice claims be first submitted to a medical review panel before any action can be filed. La. R.S. 40:1299.47. Plaintiffs claim that to discontinue dialysis, remove life-support systems and enter a "no code" order was treatment without consent and an intentional tort not covered by the malpractice act. Finding that defendants made a medical decision, the trial court sustained the exception and dismissed the lawsuit as premature. Plaintiffs have appealed.

Discussion
Patient participation in medical decision-making is now well-established. Recognizing individual autonomy and the right to self-determination, our state legislature enacted a statute granting a competent, terminally ill person the right to refuse medical treatment. La. R.S. 40:1299.58.1, et seq.
In the Karen Quinlan case the court rejected a physician's adamant stand that he had a moral duty to treat to the last gasp. In that case, the father, not the physician, was given the power to decide whether his comatose daughter's life-prolonging care was beneficial. In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976), cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). The legal basis for individual autonomy is the requirement of informed consent. Cruzan v. Director, Missouri Department of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Implicitly, the decision to refuse care is based on the patient's personal values. If a patient is incompetent, then the responsibility or authority to make decisions falls to the next of kin. La. R.S. 40:1299.58.5. The court as the protector of incompetents, however, can override an intolerable choice by a surrogate decision-maker. In re P.V.W., 424 So.2d 1015 (La.1982).
Now the roles are reversed. Patients or, if incompetent, their surrogate decision-makers, are demanding life-sustaining treatment regardless of its perceived futility, while physicians are objecting to being compelled to prolong life with procedures they consider futile. The right or autonomy of the patient to refuse treatment is simply a severing of the relationship with the physician. In this case, however, the patient (through her surrogate) is not severing a relationship, but demanding treatment the physician believes is "inappropriate."
The problem is not with care that the physician believes is harmful or literally has no effect. For example, radiation treatment for Mrs. Causey's condition would not have been appropriate. This is arguably based on medical science. Rather, the problem is with care that has an effect on the dying process, but which the physician believes has no benefit. Such life-prolonging care is grounded in beliefs and values about which people disagree. Strictly speaking, if a physician can keep the patient alive, such care is not medically or physiologically "futile;" however, it may be "futile" on philosophical, religious or practical grounds.
Placement of statistical cut-off points for futile treatment involves subjective value judgments. The difference in opinion as to whether a 2% or 9% probability of success is the critical point for determining futility can be explained in terms of personal values, not in terms of medical science. When the medical professional and the patient, through a surrogate, disagree on the worth of pursuing *1075 life, this is a conflict over values, i.e., whether extra days obtained through medical intervention are worth the burden and costs.
SFMC had in place a Futile Care Policy which allowed for the discontinuance of medical care over and above that necessary for comfort and support if the probability of improving the patient's condition was slight and would serve only to prolong life in that condition. The inclusion of non-medical persons on the Morals and Ethics Board signals that this is not strictly a physiological or medical futility policy, but a policy asserting values and beliefs on the worth of sustaining life, even in a vegetative condition.
Futility is a subjective and nebulous concept which, except in the strictest physiological sense, incorporates value judgments. Obviously, in this case, subjective personal values of the benefit of prolonging life with only a slight possibility of improvement dictated SFMC's and Dr. Harter's decision.
To focus on a definition of "futility" is confusing and generates polemical discussions. We turn instead to an approach emphasizing the standard of medical care.[2]
Physicians are professionals and occupy a special place in our community. They are licensed by society to perform this special role. No one else is permitted to use life-prolonging technology, which is considered by many as "fundamental" health care. The physician has an obligation to present all medically acceptable treatment options for the patient or her surrogate to consider and either choose or reject; however, this does not compel a physician to provide interventions that in his view would be harmful, without effect or "medically inappropriate." Lugenbuhl v. Dowling, 96-1575 (La.10/10/97), 701 So.2d 447. In recognizing a terminal patient's right to refuse care, La. R.S. 40:1299.58.1(A)(4) states that the statute is not to be construed "to require the application of medically inappropriate treatment or life-sustaining procedures to any patient or to interfere with medical judgment with respect to the application of medical treatment or life-sustaining procedures." (Emphasis added). Unfortunately, "medically inappropriate" and "medical judgment" are not defined.
A physician's obligation to obtain informed consent is both an ethical requirement and a legal standard of care derived from principles of individual integrity and self-determination. Cruzan, supra. Informed consent implicates the disclosure and explanation of all material information of the nature, purpose, expected benefit and foreseeable risks of any treatment. La. 40:1299.40. In the present case, Dr. Harter fully explained to Mrs. Causey's family the situation. The family rejected the proposed *1076 withdrawal of treatment. Despite the lack of any consent, defendants proceeded to withdraw what they considered to be "medically inappropriate" treatment.
In Lugenbuhl, supra, the court rejected intentional battery-based liability "in lack of informed consent cases (which include no consent cases) in favor of liability based on breach of the doctor's duty (negligence) to provide the patient with material information concerning the medical procedure." (Emphasis added). The court rejected its prior decision in Roberson v. Provident House, 576 So.2d 992 (La.1991), which held that performing a medical procedure without obtaining any kind of consent, as opposed to inadequate disclosure, was a battery. In a footnote, the Lugenbuhl court stated that "one can hardly argue that it is not below the appropriate standard of care for a doctor or nurse to perform a medical procedure without obtaining any kind of consent." Lugenbuhl, supra, fn. 5, p. 452.
Standards of medical malpractice require a physician to act with the degree of skill and care ordinarily possessed by those in that same medical speciality acting under the same or similar circumstances. Departure from this prevailing standard of care, coupled with harm, may result in professional malpractice liability. La. R.S. 40:1299.41. A finding that treatment is "medically inappropriate" by a consensus of physicians practicing in that speciality translates into a standard of care. Thus, in this case, whether Dr. Harter and SFMC met the standard of care concerning the withdrawal of dialysis, life-support procedures and the entering of a "no code" status must be determined. If the withdrawal of or the refusal to provide care is considered a "medical procedure," then it may be that the circumstances of this case present an exception to the supreme court's statement in Lugenbuhl that "one can hardly argue that it is not below the appropriate standard of care for a doctor or nurse to perform a medical procedure without obtaining any kind of consent."[3] In any event, the Medical Malpractice Act is applicable and the matter should first be submitted to a medical review panel.
We further find no merit to plaintiffs' claim that the Morals and Ethics Board is not a "health care provider" as defined by the La. Medical Malpractice Act. Plaintiffs have sued SFMC and do not dispute that SFMC is a qualified health care provider. The Board is part of SFMC and the fact that there are non-medical persons on it is of no greater consequence than that there are other non-medical employees of the hospital.

Conclusion
For the reasons expressed above, the judgment of the trial court dismissing plaintiffs' action as premature is AFFIRMED. Costs are assessed to plaintiffs-appellants.
WILLIAMS, J., concurs.
WILLIAMS, Judge, concurring.
I agree with the majority's conclusion that the Medical Malpractice Act is applicable in this case. The lawsuit is premature.
NOTES
[1] In the fall of 1995, Sonya Causey, a former employee of SFMC, suffered complications during childbirth which left her essentially "quadriplegic." She was transferred to the Oak Wood Nursing Home in Mer Rouge, Louisiana. Thereafter, she received dialysis three times a week at SFMC. A permanent tracheal tube was put in place to assist her in breathing. At the time of this incident, she had end-stage renal disease, diabetes mellitus, hypertension and quadriplegia.

On October 17, 1996, while at the nursing home, Mrs. Causey developed respiratory distress and was taken by ambulance to Morehouse General Hospital. She experienced cardiorespiratory arrest and was transferred to SFMC in a comatose condition. She remained at SFMC until her death on November 22, 1996. At that time she was diagnosed with stage IV coma, secondary to at least three or four cardiopulmonary arrests.
[2] This matter is further complicated by federal legislation, such as the Americans with Disability Act (ADA) and Emergency Medical Treatment and Active Labor Act (EMTALA), that preempts state law and does not recognize a health care provider's right to withdraw life-sustaining care deemed medically inappropriate. Mrs. Causey was both disabled and an emergency patient.

In re Baby K., 16 F.3d 590 (4th Cir.1994), cert. denied, 513 U.S. 825, 115 S.Ct. 91, 130 L.Ed.2d 42 (1994), presents facts similar to this case. The court in In re Baby K found that to the extent that state law exempted physicians from providing care they considered medically inappropriate, it conflicted with EMTALA provisions requiring continuous stabilizing treatment for emergency patients and was thus preempted by EMTALA. See, however, distinguishing opinion of Bryan v. Rectors and Visitors of University of Virginia, 95 F.3d 349 (4th Cir.1996).
In Bryan, supra, the Fourth Circuit backed off the sweeping statement made in the Baby K case that EMTALA imposed upon the hospital an obligation not only to admit a patient for treatment of an emergency condition, which was done, but thereafter to continuously stabilize her condition, no matter how long required. Instead, the court in Bryan stated that EMTALA was a limited "anti-dumping" statute, not a federal malpractice law. "Its core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat." Id. at 351. The court recognized that EMTALA imposed a duty on hospitals to provide emergency care and created a new cause of action "generally unavailable under state tort law, for what amounts to a failure to treat." Id. However, EMTALA was found to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment. Supra at 352. In this respect, In re Baby K was not followed. Agreeing with Bryan, we find that EMTALA provisions are not applicable to the present case.
[3] Also, if, as in this case, a surrogate decision-maker insists on life-prolonging treatment which the physician believes is inhumane, then the usual procedure, as evidenced in the reported cases, is to transfer the patient or go to court to replace the surrogate or override his decision. The argument would be that the guardian or surrogate is guilty of abuse by insisting on care which is inhumane.