880 So.2d 145 (2004)
Oris PETTIS, Plaintiff-Applicant
v.
Steve SMITH and Diane Smith Braddock, et al., Defendant-Respondents.
No. 39,295-CW.
Court of Appeal of Louisiana, Second Circuit.
August 13, 2004.
*146 Jack Wright, Jr., Monroe, for Applicant.
J. Michael Hart, for Respondents.
Before BROWN, GASKINS, CARAWAY, PEATROSS and MOORE, JJ.
MOORE, J.
The plaintiff, Oris Pettis, seeks supervisory review of a judgment rejecting her petition for a preliminary injunction. Mrs. Pettis sought to enjoin her brother and sister, Steve Smith and Dianne S. Braddock, from implementing the written declarations (commonly referred to as "living wills") in which their mother, Mrs. Doris H. Smith, directed the withdrawal of life-sustaining medical procedures in the event she should have a terminal and irreversible condition. This court took the matter on an expedited basis and referred it to a five-judge panel to obviate the additional delay of a rehearing. URCA Rule 2-18.5. Finding no error in the district court's ruling, we deny the application.

Factual Background
Mrs. Smith, referred to in the proceedings below as "Mrs. Doris," is an 89-year-old resident of Chatham, Louisiana. An active, outgoing and religious person, Mrs. Doris suffered a debilitating stroke in March 2004. Although she survived, she no longer has any significant brain function. Her treating physician, Dr. Amin El-Malah, testified that she now suffers from global aphasia, meaning she can neither understand nor speak. Although she is no longer in a coma, he described her as in a "semi-coma," having reached a "flat line," and that any further improvement in her condition would require a "miracle."
Another physician, Dr. Antti G. Maran, examined Mrs. Doris in late May at Glenwood Regional Medical Center and assessed her condition as a "vegetative state," with no chance of improvement. Mrs. Doris is unable to feed herself or eat, and has been receiving nourishment through a gastric feeding tube. Both doctors testified that through this intervention, she could be kept alive for a year or two, or even longer; however, if the tube were withdrawn, she would live only "a few days, to a week." Since becoming unable to care for herself, Mrs. Doris has developed bedsores despite being in a care facility. She was receiving antibiotics for a urinary tract infection and did not require a ventilator.
On May 26, 2004, after consideration of their mother's condition, Steve Smith and Dianne Braddock indicated to Glenwood, by completing a form, that the hospital should stop providing Mrs. Doris nutrition through the gastric feeding tube. Mr. Smith and Mrs. Braddock informed Dr. El-Malah, her treating physician, that Mrs. Doris had executed living wills in March 2001, described below. Drs. Maran and El-Malah signed the form, attesting that Mrs. Doris would die whether or not life-sustaining procedures are utilized, and that the application of such procedures would serve only to prolong artificially the dying process.
Mrs. Pettis opposed the withdrawal of nutrition, and on June 7 filed the instant petition for an injunction. The district court issued a TRO preventing Glenwood from withdrawing "any life-sustaining procedure" from Mrs. Doris.

The Declarations
The hearing on the preliminary injunction was held on July 27 and 28, 2004. At the hearing, the declarations were introduced into evidence, with much testimony concerning them. On March 24, 2001, Mrs. Doris executed two essentially identical documents entitled "Power of Mandatary *147 to Make Health Care Decisions."[1] Mrs. Doris executed these in the presence of two of her children, Steve Smith and Dianne S. Braddock, Dianne's husband Alton Braddock, Raymond Spires and Rich Waldrop. Mrs. Pettis was not present.
The declarations contain two substantive sections. In the first, captained "Power of mandatary to make health care decisions on behalf of principal," Mrs. Doris appointed Mrs. Pettis and Mrs. Braddock as her mandataries to make her health care decisions. They do not specify which daughter's judgment would have priority in the event of a disagreement. However, the declarations specifically prohibit her daughters from making decisions about life-sustaining procedures pursuant to La. R.S. 40:1299.58.1, et seq. The second section, captioned "Declaration of living will for terminal illness pursuant to La. R.S. 40:1299.58.1," declares:
I willfully and voluntarily make known my desire that my dying shall not be artificially prolonged under the circumstances set forth below and do hereby declare:
If at any time I should be diagnosed as having incurable injury, disease, or illness certified to be a terminal and irreversible condition by two physicians who have personally examined me, one of whom shall be my attending physician, and the physicians have determined that my death will occur whether or not life-sustaining procedures are utilized and where the application of life-sustaining procedures would serve only to prolong artificially the dying process; I direct that such procedures be withheld or withdrawn and that I be permitted to die naturally with only the administration of medication or the performance of any medical procedure deemed necessary to provide me with comfort care.
In the absence of my ability to give directions regarding the use of such life-sustaining procedures, it is my intention that this declaration shall be honored by my family and physician(s) as the final expression of my legal right to refuse medical or surgical treatment and accept the consequences of such refusal. I understand the full import of this declaration and appointment of my Attorney in Fact and I am emotionally and mentally competent to make this declaration.
This declaration language tracks, almost verbatim, the form provided in La. R.S. 40:1299.58.3. The documents are each signed by Mrs. Doris; Mrs. Pettis testified that she recognized her mother's signature thereon. Each daughter signed (in the first section) the respective declaration to accept her appointment as mandatary; Mrs. Pettis testified that she received her copy by mail and did not sign it until May 30, 2004. Each declaration is also signed by two witnesses, Raymond Spires and Rich Waldrop. Finally, each is notarized by Mrs. Braddock's husband, Alton Braddock. Mr. Braddock is not a legatee in Mrs. Doris's will.
The witnesses described in detail the execution of the declarations. Raymond Spires testified that "somebody" phoned him on March 24, 2001, to come to Mrs. Doris's house (across the street from his own) to be a witness. He was in the room when Mrs. Doris signed the document but said that he did not see heror any of the othersaffix their signatures. He admitted, however, "But I'm sure she did. I didn't witness it. * * * I wasn't paying any attention." He had no reason to believe that Mrs. Doris did not sign the documents; in fact, the family and witnesses *148 had gathered around her kitchen table for that express purpose.
Mr. Braddock testified that he is married to Mrs. Doris's daughter, and notarized these declarations. He said he had several times discussed with Mrs. Doris her wishes and desires about being maintained on life-sustaining therapy if she were terminally ill beyond recovery. The living wills were prepared at Mrs. Doris's insistence; she had told him "she never wished to be artificially kept alive and cited as two examples * * * a ventilator and a feeding tube." He elaborated:
Mrs. Smith had expressed to me and others her desire not to be artificially maintained if she had got into the physical condition where she was having to be maintained through some artificial means and again I can't cite you exactly the time that she did this but at one of the occasions that I am having a discussion with her about preparing the living will or notarizing a living will for her, she cited specifically no use of a ventilator and no feeding tube.
He testified that Mrs. Doris knew what she was signing when she signed the declarations, and that they were consistent with what she had expressed to him in the past. Mr. Braddock detailed the procedure used at the execution of the declarations: the documents were unsigned at the outset, and the witnesses seated around the table; Mrs. Doris then signed each one, and each witness signed in turn before he notarized each. No one left the room during the signing process.
William Waldrop testified he had known Mrs. Doris for 11 years. He admitted that he had signed the declarations as a witness, and corroborated that he and the others sat around Mrs. Doris's kitchen table to sign them. He stated that he saw her sign each document, and everyone remained around the table while papers were passed around and signed. He added that Mr. Spires was seated right next to him at the table; he assumed that Spires was watching.
Steve Smith essentially corroborated the other witnesses' accounts of the signing, noting that Mrs. Doris signed them first and that everyone remained at the table until the matter was completed. He also recalled several conversations with his mother concerning care at the end of her life:
There were times when she and I would go, I'd pick her up and we'd go out to eat and she would talk about she never wanted to be in a nursing home, she never wanted to be on life support, you know, and she said, "And that's why I've got my living will because I don't want this."
He admitted he had never discussed with her the provision of a feeding tube as a treatment measure, but felt his mother fully understood what the living will stated. He also described his mother's current condition in terms similar to Dr. El-Malah's.

Action of the District Court
The court issued a thoughtful 15-page written ruling, upholding the validity of the declarations. The court found a sufficient number of qualified witnesses. The court further found that Mrs. Doris signed the declarations in the presence of the witnesses:
All the witnesses to the document in question testified that they came to the home of Mrs. Doris for the express purpose of being witnesses to the document. Each witness indicated that they had a brief explanation given to them as to why they were there once they arrived. Each witness indicated that the signing procedures took place in the kitchen at a specific table and the document in question *149 started out with no signatures, traveled to Mrs. Doris for her signing, and eventually made its way to the respective witness without leaving the kitchen area. Each witness indicated that Mrs. Doris was within their ability to see if not actually within their actual sight at the time she signed. Consequently, each witness was in the company[2] of Mrs. Doris and, hence, "in the presence of."
The court observed that the case was not about the aspirations that loving children have for their mother; rather, about Mrs. Doris's right to make her own decisions about health matters, and for the court to decide when the children cannot agree:
Neither this court nor others should assume that it is better to "live" with significant disabilities than to "die" with the degree of dignity that one desired at the time they executed their very own living will making clear their wishes relative to treatment when and if they become no longer able to make health care choices themselves.
The court therefore dissolved the TRO, denied the demand for a preliminary injunction, and dismissed the plaintiff's suit. The court also signed an order captioned "Expedited / Article 1918 judgment," designating its written reasons for judgment as the judgment.
Mrs. Pettis filed a motion for suspensive appeal, which the district court denied under La. C.C.P. art. 3612 B. She did not convert her motion to one for a devolutive appeal; however, she filed a motion for a stay, which the court denied. She then sought supervisory review in this court. This court granted a stay pending decision and ordered the entire record.

Statutory Background
Twenty years ago, the legislature enacted La. R.S. 40:1299.58.1 et seq., recognizing the right of a person to refuse medical care and to declare that refusal in advance of a circumstance when the person might be unable to make the decision herself. In the intervening years, no reported Louisiana decisions have interpreted these provisions to determine the validity of a written declaration.
The legislative purpose, findings and intent are stated in R.S. 40:1299.58.1:
A. Purpose and findings. (1) The legislature finds that all persons have the fundamental right to control the decisions relating to their own medical care, including the decision to have life-sustaining procedures withheld or withdrawn in instances where such persons are diagnosed as having a terminal and irreversible condition.
(2) The legislature further finds that the artificial prolongation of life for a person diagnosed as having a terminal and irreversible condition may cause loss of individual and personal dignity and secure only a precarious and burdensome existence while providing nothing medically necessary or beneficial to the person.
(3) In order that the rights of such persons may be respected even after they are no longer able to participate actively in decisions concerning themselves, the legislature hereby declares that the laws of the state of Louisiana shall recognize:

*150 (a) The right of such a person to make a declaration instructing his physician to withhold or withdraw life-sustaining procedures or designating another to make the treatment decision and make such a declaration for him, in the event he is diagnosed as having a terminal and irreversible condition; and
(b) The right of certain individuals to make a declaration pursuant to which life-sustaining procedures may be withheld or withdrawn from an adult patient who is comatose, incompetent, or otherwise physically or mentally incapable of communication, or from a minor, in the event such adult patient or minor is diagnosed and certified as having a terminal and irreversible condition.
(4) In furtherance of the rights of such persons, the legislature finds and declares that nothing in this Part shall be construed to be the exclusive means by which life-sustaining procedures may be withheld or withdrawn, nor shall this Part be construed to require the application of medically inappropriate treatment or life-sustaining procedures to any patient or to interfere with medical judgment with respect to the application of medical treatment or life-sustaining procedures.
B. Intent. (1) The legislature intends that the provisions of this Part are permissive and voluntary. The legislature further intends that the making of a declaration pursuant to this Part merely illustrates a means of documenting a patient's decision relative to withholding or withdrawal of medical treatment or life-sustaining procedures.
(2) It is the intent of the legislature that nothing in this Part shall be construed to require the making of a declaration pursuant to this Part.
(3) It is the intent of the legislature that nothing in this Part shall be construed to be the exclusive means by which life-sustaining procedures may be withheld or withdrawn, nor shall this Part be construed to require the application of medically inappropriate treatment or life-sustaining procedures to any patient or to interfere with medical judgment with respect to the application of medical treatment or life-sustaining procedures.
Appellate review of a lower court's factual findings is governed by the manifest error analysis. Stobart v. State, 617 So.2d 880 (La.1993). This analysis requires a two-part test: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is not clearly wrong or manifestly erroneous. Cole v. State, 2001-2123 (La.9/4/02), 825 So.2d 1134; Mart v. Hill, 505 So.2d 1120 (La.1987).

Discussion: Qualification of Witnesses
By her first assignment of error, Mrs. Pettis urges the declarations were invalid because they were not properly witnessed. Specifically, she contends that Mr. Braddock was not qualified because he was related to Mrs. Doris and Mr. Spires did not actually observe her signing the documents in question.
A written declaration or living will "shall be signed by the declarant in the presence of two witnesses." La. R.S. 40:1299.58.3 A(2). A witness is defined in the statute as a "competent adult who is not related to the declarant * * * by blood or marriage and who would not be entitled to any portion of the estate of the person from whom life-sustaining procedures are to be withheld or withdrawn upon his decease." La. R.S. 40:1299.58.2(15). The statute does not define "presence," and it prescribes *151 no further requirement that the written declaration must be notarized.
The words of a law must be given their generally prevailing meaning. La. C.C. art. 11; La. R.S. 1:3. Black's Law Dictionary (6th ed.) defines "presence" in part as:
Act, fact or state of being in a certain place and not elsewhere, or within sight of call, at hand, or in some place that is being thought of. The existence of a person in a particular place at a given time particularly with reference to some act done there and then.
The question posed is whether "presence," as used in the statute, requires that the witness actually see the declarant write her name on the declaration or whether, in the absence of such an observation, the witness's physical presence at the signing, combined with other observations, may suffice.
The most ready analogy is to the interpretation of "presence" in the context of notarial testaments. See, e.g., La. C.C. art. 1577 (formerly La. R.S. 9:2442); Succession of Smith, 01-930 (La.App. 5 Cir. 1/15/02), 806 So.2d 909, writ denied, XXXX-XXXX (La.5/3/02), 815 So.2d 105; State v. Interiano, XXXX-XXXX (La.2/13/04), 868 So.2d 9. In Succession of Smith, supra, the witnesses were not in the same room as the testator when she signed the will. The court noted the strict adherence of formalities that attend the execution of wills. Nevertheless, the court held that being outside the room, alone, will not invalidate an otherwise valid notarial will: "The article requires only that the witnesses and notary be `in the presence of' the testator when the document is signed." The court invalidated the will on the finding that the witness was not only not in the room, but down the hall, and signed at a different time.
There is no requirement that a witness recall the contents of the documents he signs. See, e.g., Succession of Norton, 451 So.2d 1203 (La.App. 5 Cir.1984). Mrs. Pettis herself admitted at trial that she recognized the signature on the declarations as her mother's. Each witness to the execution testified that it was a single, continuous transaction, and that no one left the room or the presence of Mrs. Doris while the documents were being completed. All were fully aware of the purpose of the meeting. Mr. Braddock was explicit that the declarations bore no signatures before the meeting began, and all signatures were affixed during it.
Simply put, there is ample support in the record that Mr. Spires was present during the entire process of signing the declarations, and there is absolutely no doubt that Mrs. Doris indeed signed them. On this record, the district court was entitled to find that Mr. Spires was "in the presence of" Mrs. Doris and thus not disqualified as a witness.
Mrs. Pettis correctly shows that Mr. Braddock was Mrs. Doris's son-in-law, related to her by marriage, and therefore disqualified under R.S. 40:1299.58.1(15). However, she has not challenged either of the other two witnesses, Waldrop and Spires, on these grounds. Because the document was witnessed by these two persons, whose qualifications have not been challenged except on the grounds already discussed, the district court properly upheld the declarations as conforming to R.S. 40:1299.58.3 A(2). Cf., Estate of Wartelle, 428 So.2d 1300 (La.App. 3 Cir.), writ denied, 433 So.2d 151 (La.1983). The first assignment of error lacks merit.

Informed Consent
By her second assignment, Mrs. Pettis urges that even if the declarations are technically valid, the court erred in *152 failing to find that the nutrition sought to be withdrawn from Mrs. Doris constitutes "comfort care" and that Mrs. Doris did not give informed consent "that the execution of the living will could condemn her to death by starvation or dehydration." Mrs. Pettis speculates that her mother would never have agreed to the declarations had she known they could lead to such a result.
As originally enacted, Louisiana's living will statute was silent on whether an artificial feeding device is a "life-sustaining procedure." See, Michael Vitiello, Louisiana's Natural Death Act and Dilemma in Medical Ethics, 46 La. L.Rev. 259, 295 (1985). However, the legislature amended the definition of "life-sustaining procedure" in 1991. The statute now provides:
"Life-sustaining procedure" means any medical procedure or intervention which, within reasonable medical judgment, would serve only to prolong the dying process for a person diagnosed as having a terminal and irreversible condition, including such procedures as the invasive administration of nutrition and hydration and the administration of cardiopulmonary resuscitation. A "life-sustaining procedure" shall not include any measure deemed necessary to provide comfort care.
(Emphasis added.)
Notably, the legislature did not simultaneously amend the language in the illustrative declaration of La. R.S. 40:1299.58.3, which Mrs. Doris used in this case. Since Mrs. Doris's intent is principally reflected on the face of the document she signed, Mrs. Pettis argues that she expressed no intent for the removal of feeding tubes. We disagree. Mrs. Pettis's argument would require that the statutory declarations under R.S. 40:1299.58.3 be amended by each person desiring a living will to specifically list the types of "life-sustaining procedures" to be withdrawn from that person. Such construction of the statutory declaration misconstrues its purpose and might cause all living wills executed under this statute to suffer from the same deficiency and be ineffective. The statutory declaration reflects the declarant's overall intent to allow two physicians, including her attending physician, to certify her condition as "terminal and irreversible" and that once that essential determination is made, all medical treatment, other than comfort care, may be terminated.
Mrs. Pettis also argues that the defendants must prove by clear and convincing evidence that Mrs. Doris's declaration encompassed the withdrawal of nutrition and hydration, citing Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). We disagree. In Cruzan, the supreme court held:
[A] state may apply a clear and convincing standard in proceedings where a guardian seeks to discontinue nutrition and hydration of a person diagnosed to be in a persistent vegetative state.
(Emphasis added.)
Cruzan clearly does not require the imposition of such a standard of proof; it merely permits the state to do so. Louisiana has adopted a detailed legislative scheme outlining procedures by which a person may make this decision in advance of the need. The district court was mindful of the legislative purposes expressed by the statute and we find no manifest error in the finding that Mrs. Doris executed her declarations with informed consent.

Conclusion
For the reasons expressed, we find no error in the judgment denying the preliminary injunction and upholding the living will declaration. The application for supervisory *153 review is therefore denied at Mrs. Pettis's costs.
WRIT DENIED.
PEATROSS, J., concurs in the result.
NOTES
[1] Apparently there was also a third identical document naming Steve Smith as mandatary.
[2] The court cited a definition of "presence" from World Book Dictionary: "the fact or condition of being present in a place. In the presence of, in the sight or company of: in the presence of danger. He signed his name in the presence of two witnesses." (Emphasis in original.)