Dear Mr. Perez:
You requested an attorney general's opinion on several questions dealing with the use of a model or form known as the "Physician Orders for Life Sustaining Treatment" (POLST) to be used for end-of-life care in Louisiana. You explain that POLST is a document designed to help health care providers honor the treatment wishes of their patients by transferring the patient's wishes for end-of-life care to a doctor's order. You further explain that a POLST is a voluntary document and is not intended to replace an advance directive but that, nevertheless, it is based on a declaration that complies with R.S. 40:1299.58.1 etseq. According to your description, a POLST is designed to centralize information, facilitate record-keeping, and ensure transfer of appropriate information among health care providers and care settings. Your explanation tells us that an original POLST is posted in a visible manner over the patient's bed and a copy is kept in the patient's medical chart. You further inform us that if the basis of the POLST is a written declaration, then a copy of the written declaration or living will shall be kept with a copy of the POLST in the declarant's medical record but that if the declaration is an oral declaration, then the doctor may use POLST as a tool to comply with the requirements set forth in R.S. 40:1299.58.3(B)(3).
More specifically, you ask the five following questions concerning a POLST:
 1. Whether the POLST model can be implemented in Louisiana without legislative action.
 2. Whether a POLST must bear the signatures of two physicians.
 3. Whether a POLST that is based on an oral declaration must bear the signature of two witnesses. *Page 2 
 4. Whether a POLST can be followed by an attending physician independent of another physician's presence.
 5. Whether the immunity provision set forth in R.S. 40:1299.58.8 extends to physicians who follow a POLST.
In addition, you enclosed some sample POLST forms for our information.
We must begin with the most fundamental principle intended to be implemented by all these devices and paradigms and always keep it foremost in mind; such principle was set forth by the legislature as follows: "The legislature finds that all persons have the fundamental right to control the decisions relating to their own medical care," R.S.40:1299.58.1(A)(1). Thus, a POLST can be legally effective only insofar as it complies with the wishes of the patient relating to his own health care. If a POLST posted above a patient's bed says not to give the patient nutrition or hydration and the patient is conscious and suddenly requests hydration (even by intravenous method), any attending health care provider hearing this request must give such hydration to him, regardless of what the POLST says, and then should promptly notify the attending physician of the this request and the new wishes of the patient and what has been done to comply with same. A patient can always change his mind and communicate that change, and he does not have to go through a series of formalties to have his new wishes immediately implemented. The same would be true if the patient's personal wishes are unknown, the patient is unconscious, and the patient's designated surrogate makes a new request. If the attending physician or hospital disagrees with a patient's or surrogate's request, Causey v. St. FrancisMed. Cntr., 30,732 (La.App. 2 Cir. 8/26/98), 719 So.2d 1072, gives the instruction for the physician or hospital "to transfer the patient or go to court to replace the surrogate or override his decision. The argument would be that the guardian or surrogate is guilty of abuse by insisting on care which is inhumane," id., p. 7 n. 3, 719 So.2d at 1076, n. 3. Indeed, Subsections B and D of R.S. 40:1299.58.7 provide,
 "B. Any attending physician who refuses to comply with the declaration of a qualified patient or declaration otherwise made pursuant to this Part shall make a reasonable effort to transfer the patient to another physician."
 "D. If the policies of a health care provider preclude compliance with the declaration of a qualified patient under this Part or preclude compliance with the provisions pertaining to a representative acting on behalf of a qualified patient, then the provider shall take all reasonable steps to transfer the patient to a provider with which the provisions of this Part can be effectuated."
Another fundamental principle in law that must be always kept in mind regarding medical treatment is that the patient's consent must be a fully and properly informed consent. His attending physician must try to resolve anomalies, clarify confusion, and *Page 3 
explain the details of the situation so that the patient knows exactly what he is consenting to. For example, the Second Circuit Court of Appeal in Pettis v. Smith, 39,295 (La.App. 2 Cir. 8/13/04),880 So.2d 145, Writ Den. 2004-2125 (La. 8/18/04), 882 So.2d 551, held that under the living will statute, artificial nutrition and hydration constituted "life-sustaining procedure," not "comfort care," and thus, declarant gave informed consent implicitly to withdrawal of nutrition and hydration in making a living will calling for the withholding of life-sustaining procedures. The court concluded that the mutual exclusivity of these two classifications — "life-sustaining procedures" and "comfort care" — was required by the fact that the statute created two distinct definitions, but, in reality, the withholding of hydration and resultant dehydration, for example, can trigger in some people symptoms that are seriously uncomfortable. The attending physician should explain these details to the patient when discussing exactly what the patient's wishes are.
With these basic understandings, we can proceed to your specific questions:
As to your first question, we do not think that the statutes have to expressly provide all the means whereby one can accomplish the fundamental principles and goals of medical treatment. Indeed, R.S.40:1299.58.1(A)(4) clarifies the legislative intent that when a patient chooses to have life-sustaining procedures withheld in a life-ending situation, "nothing in this Part shall be construed to be the exclusive means by which life-sustaining procedures may be withheld or withdrawn,"id. Thus, subject to the conditions that a POLST truly clarifies the patient's informed consent and wishes regarding his own medical treatment and that a patient can later change his mind and no one then can be a slave to a thereby obsolete POLST in violation of the patient's newly expressed informed consent, our opinion is that legislation is not necessary to employ a POLST to implement the patient's wishes. Of course, although new legislation may not be necessary in order to employ a POLST, new legislation might, nevertheless, be desirable, from the viewpoint of its proponents, in order to provide any specifically needed, legally-binding details regarding the use of a POLST.
Taking your fifth question out of order, our reading of R.S.40:1299.58.8 is that there are really two forms of immunity contained in R.S. 40:1299.58.8. The first form is contained in Subsection A of the statute and is almost absolute immunity more easily proven than the second form by showing that the physician or health care provider followed a patient's declaration made in accordance with the requirements set forth in R.S. 40:1299.58.1 et seq. As long as the patient's declarations noted and implemented in the POLST complies with the requirements set forth in R.S. 40:1299.58.1 et seq, it is our opinion that that particular statutory immunity will apply. If the patient's declarations that the POLST implements are not made under the requirements set forth in R.S. 40:1299.58.1 et seq., it is our opinion that the immunity granted in Subsections B and C of R.S. 40:1299.58.8
may or may not apply. To determine whether the immunity applies or does not apply will depend on an evidentiary hearing to determine whether the physician or health care provider was in good faith following the patient's or his designated surrogate's wishes; in a medical malpractice case, such issue may go to the overall merits of the case and may not be determined until the conclusion of the medical malpractice trial. Thus, our strong recommendation is that the POLST should *Page 4 
specifically document in detail the fulfillment of the requirements set forth in R.S. 40:1299.58.1 et seq. in the making of the patient's declaration on which the POLST is based.
One of the requirements we think the legislature intended for the actual implementation and effectuation of a patient's declaration made pursuant to the provisions of R.S. 40:1299.58.1 et seq. is that a diagnosis and certification in writing be made by two physicians who have personally examined the patient, one of whom shall be the attending physician, that the patient has a terminal and irreversible condition.See, for example, R.S. 40:1299.58.2(12) and R.S. 40:1299.58.3(C)(1). To answer your second question, we do not think that the POLST must itself bear the signatures of two physicians, but it should clearly state what the diagnosis is and clearly identify by name, medical clinic or medical firm, address, and telephone number the two physicians who made the diagnosis and designate which one is the attending physician. Of course, in the usual case, the attending physician will himself sign the POLST as his own "physician's orders."
Another requirement is that there be two witnesses to the patient's declaration. See R.S. 40:1299.58.3(A)(2) and (3). Also, if a declaration is oral, the physician must promptly recite the reasons that the declarant could not make a written declaration and make such recitation a part of the declarant's medical records. R.S. 40:1299.58.3(B)(4). As to your third question, again, we do not think that the witnesses necessarily have to sign the POLST itself, but the POLST should recite clearly the detailed circumstances of the patient's declaration, the reasons that the declaration could not be written but was oral, if it was, and clearly identify by name, address, and telephone number the two witnesses to the declaration, so that, if the witnesses are contacted, they can confirm that they witnessed the patient's declaration and clearly state what that declaration was. Of course, if the declaration was in writing, it would have to be witnessed by two witnesses who would sign the written declaration, and a copy of the written declaration would, according to what you have told us, be in the patient's medical record. In that case, the POLST should recite these facts.
Your fourth question is complicated, and the circumstances in which it arises must be understood. Our understanding is that it relates to several questions about the timing of an oral declaration and the diagnosis, which, in order to comply with R.S. 40:1299.58.1 etseq., must be made by two physicians (one being the attending physician) who must personally examine the patient and diagnose and certify in writing that the patient has a terminal and irreversible condition. This situation would include the example where a ninety year old person in good health with no terminal or other serious disease is approached by the attending physician to sign a POLST incorporating an oral declaration. In our opinion, such a method of obtaining an oral declaration may likely be without legal effect under R.S. 40:1299.58.1et seq. R.S. 40:1299.58.3(A)(3) explicitly provides,
 "(3) An oral or nonverbal declaration may be made by an adult in the presence of two witnesses by any nonwritten means of communication at any time subsequent to the diagnosis of a terminal and irreversible *Page 5 
condition."
(Emphasis added.) The person may be ninety years old but suffers from nothing but elderly age. The time is not ripe for an oral declaration pursuant to R.S. 40:1299.58.1 et seq. When and if this person develops a terminal and irreversible condition where death will inevitably result within a short period of time, then and only then two physicians (one being the attending physician) must personally examine the patient and diagnose and certify in writing that the patient has a terminal and irreversible condition. Once that is done, an oral declaration may be taken if the patient cannot issue a written declaration. Of course, the patient may issue a written declaration at any time, but it must comply with the requirements of R.S. 40:1299.58.1 et seq.
Also as to this fourth question, our understanding of the circumstances under which some of the problems arise include, for example, a nursing home or a hospital where elderly and/or other patients admitted there are routinely approached by physicians or other health care providers who seek to write up a POLST on them for the future and who, in connection therewith, ask, in a perfunctory and/or peremptory manner, that the person make an "end-of-life" declaration under R.S. 40:1299.58.1 et seq., in order to complete the POLST. The clear circumstantial inference in such a case is that making such a declaration for the POLST is part of the routine paperwork that must be completed as part of the nursing home's, hospital's, or physician's acceptance of the person as a patient for the purpose of providing that patient continued health care. In that situation, such a practice directly violates R.S. 40:1299.58.10(B)(4), which provides, "A person shall not be required to make a declaration as a condition for being insured or for receiving health care services." (Emphasis added.) In order to avoid such a violation of law, the patient should first be made to understand that he or she does not have to make any "end-of-life" declaration. The POLST should document what the patient was told about not having to make an "end-of-life" declaration, and if the patient decides not to make one at that time, the POLST should recite that fact.
We should make one last note. Despite the literal reading that these statutes can sometimes be susceptible to, the situation intended by these statutes is where the life-threatening, terminal, and irreversible condition or disease has brought the patient to imminent death. Otherwise, common sense and good medical practice should prevail. For example, if a patient has prostate cancer, which, after radiation treatment, has recurred and which, after hormone therapy, has become hormone refractory, it can properly be said that he has a life-threatening, terminal, and irreversible condition and disease, because no treatment, beyond that which he has already had, is known to cure the disease, which is eventually terminal. Yet, his Prostate Specific Antigen (PSA) may still be only 0.2, and he can be expected to live a unimpaired life for years to come. If that patient also develops a digestive disorder, the cause of which is unbeknownst to him, and becomes weak, debilitated, and dehydrated from lengthy reflux vomiting and is hospitalized, he should not have withheld either artificial nutrition (if, though rarely, it would be needed in this situation) or artificial hydration (which would usually be required in this situation). Withholding either, if needed, would be highly inappropriate. Rather, the proper medical practice would be to stop the vomiting by medication (such as Reglan), intravenously hydrate him, and treat the reflux disease (with, for example, Acifex or Protonix), so that he could return to health and enjoy his years yet to live. *Page 6 
Indeed, R.S. 40:1299.58.10(E) provides,
 "E. It is the policy of the state of Louisiana that human life is of the highest and inestimable value through natural death. When interpreting this Part, any ambiguity shall be interpreted to preserve human life."
We trust that this opinion has adequately answered your opinion request, but if you need to ask additional questions, please do not hesitate to ask them of us. With warmest regards, we remain
 Yours very truly,
 CHARLES C. FOTI, JR.
 ATTORNEY GENERAL
 By:__________________________
 THOMAS S. HALLIGAN
 Assistant Attorney General